IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DENNIS LIEBERMAN, *et al.,* | : | |
| Plaintiffs, | : | Case No. 3:12-cv-297 |
| vs. | : | |
| | | JUDGE WALTER H. RICE |
| JON HUSTED, Individually, and in his Official Capacity as Secretary of the State of Ohio, *et al.,* | : | |
| | : | |
| Defendants | : | |

## DECISION AND ENTRY OVERRULING PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTION; CONFERENCE CALL SET

Following their removal from the Montgomery County Board of Elections ("the Board") by Defendant Jon Husted, Plaintiffs Dennis Lieberman and Thomas Ritchie, Sr., filed suit against Husted, individually and in his capacity as the Secretary of State of Ohio.  Plaintiffs alleged that Husted violated their procedural and substantive due process rights, their First Amendment rights, and their right to equal protection of the law as guaranteed by the Constitution of the United States. They also alleged wrongful termination in violation of Ohio law.

In addition to money damages, Plaintiffs sought temporary and permanent injunctive relief in the form of an order deferring any action to replace them as members of the Board and requiring the Secretary of State to restore them to their previous positions.  This matter is currently before the Court on Plaintiffs' request for a preliminary injunction.  The Court held a hearing on September 21, 2012, and

the parties subsequently filed post-hearing briefs.

## I.     Background

Under Ohio law, each county Board of Elections consists of two Republicans and two Democrats.  *See* Ohio Revised Code § 3501.06.  In the months leading up to this lawsuit, members of the Montgomery County Board of Elections included Republicans Greg Gantt and Kay Wick, and Democrats Thomas Ritchie, Sr., and Dennis Lieberman.  Plaintiff Ritchie, the Chairman of the Board, was first appointed to the Board in 1995, having been appointed to his current term of four years on February 28, 2010.  Plaintiff Lieberman has served on the Board since 2001, having been appointed to his current four-year term on February 28, 2012.

In many places throughout the State of Ohio, the 2004 presidential election was plagued by long lines at the polls.  In an effort to remedy the problem, the State decided to allow county boards of elections to establish early voting hours, whereby voters could appear in person to cast absentee ballots in the weeks leading up to an election.  Since 2005, early voting, including early weekend voting, has been offered in Montgomery County and elsewhere around Ohio.  Hr'g Tr. at 44-46.

In Montgomery County, 29,000 people cast early in-person votes in the 2008 presidential election.  Of those, 12,000 people, many of them minorities, cast their votes on the weekends.  Lieberman Aff. ¶¶ 12-13; Hr'g Tr. at 57.  In

2

December of 2011, after the Ohio legislature sought, ultimately unsuccessfully, to eliminate the last three days of early in-person voting, the Montgomery County Board of Elections unanimously voted to continue early in-person weekend voting for the 2012 presidential election, except for the last weekend before the election, relying on Ohio Revised Code § 3509.03, which requires the polls to close by 6:00 p.m. on the last Friday before the election.  Defs.' Ex. 3.  By spreading out the voting over the course of several weeks, the Board was able to eliminate some precincts and polling places on Election Day, saving the county almost $200,000. Hr'g Tr. at 46.

On August 15, 2012, the Ohio Secretary of State, Republican Jon Husted, issued Directive 2012-35 to all county boards of elections.  Defs.' Ex. 4.  The Directive concerned "In Person Absentee Voting Days and Hours."  In that Directive, Husted acknowledged that local boards of elections have the authority to set their own hours of operation for in-person absentee voting, but noted that this leads to a "patchwork" of policies that vary from county to county.  Seeking "to level the playing field on voting days and hours during the absentee voting period in order to ensure that the Presidential Election in Ohio will be uniform, accessible for all, fair, and secure," Husted directed all county boards of elections to adopt the "regular business hours" set forth in the Directive, on Mondays through Fridays between October 2, 2012, and November 2, 2012.  *Id.*

The Board met early on the morning of Friday, August 17, 2012, to discuss Directive 2012-35.  According to the transcript of that meeting, Lieberman, referring to the Directive, initially stated, "from my read of this he's eliminated all

3

weekend early voting." Defs.' Ex. 6, at p. 6. Lieberman believed that Husted lacked authority to eliminate early weekend voting. In Lieberman's view, eliminating early weekend in-person voting would be unconstitutional because it would disparately impact minority voters. In addition, each local board of elections was required to "keep its offices and rooms open for a period of time that the board considers necessary for the performance of its duties," Ohio Revised Code § 3501.10(B), and to "[f]ix and provide the places . . . for holding elections," Ohio Revised Code § 3501.11(B). In 2011, the Board determined that early weekend in-person voting was necessary for the 2012 presidential election.

Lieberman therefore stated that he was "going to move that we do not follow the directive when it comes to weekend voting and that we keep our schedule for weekend voting." Defs.' Ex. 6, at p. 6-7. He explained that, in his opinion, because the Directive was completely silent on the subject of weekend voting, his motion was not inconsistent with it.[1] *Id.* at p. 7. Lieberman made a motion "to follow the directive as it applies from Monday-Friday" but to keep in place the early weekend hours that had been previously adopted by the Board. *Id.*

The vote split down party lines, with Ritchie and Lieberman voting in favor of the motion, and Gantt and Wick voting against it. Under Ohio law, in cases of a tie vote, the Board is to submit the matter to the Secretary of State within 14 days, "who shall summarily decide the question" and whose decision is final. Ohio

---

[1] Ohio Revised Code § 3501.11(E) requires each board of elections to "[m]ake and issue rules and instructions, not inconsistent with law or the rules, directives, or advisories issued by the secretary of state, as it considers necessary for the guidance of election officers and voters."

Revised Code § 3501.11(X). The parties agreed to submit their position papers on the tie vote to the Secretary of State by August 22, 2012, and then agreed to recess the meeting. Defs.' Ex. 6, at p. 11-12.

Shortly after the morning meeting ended, Betty Smith, the Director of the Montgomery County Board of Elections, notified the Secretary of State's Office of the tie vote. Later that same morning, Matt Damschroder, Director of Elections for the Ohio Secretary of State, sent a letter to Ritchie, with copies to the other Board members.[2] Damschroder stated that it had come to his attention that the Board had tied "on whether to fully implement Directive 2012-35 . . . by adding days and hours not included in the Directive. Any days and hours other than those specifically delineated in the Directive is a violation of the Directive." Defs.' Ex. 7. Damschroder ordered the Board to reconvene that same afternoon "to rescind the motion that resulted in a tie this morning and act consistent with Directive 2012-35." He warned that "[f]ailure to act consistent with and voting in contravention of a Directive is at best nonfeasance and subjects a Board member to possible removal." *Id.*[3]

---

[2] There is some question as to whether Damschroder had seen a complete transcript of the morning meeting at the time he issued this letter. In the Court's view, this is largely irrelevant to the issues presented here.

[3] Plaintiffs argue that Damschroder's interpretation of the Directive is not binding, and that Damschroder had no authority to issue this letter. Nothing in the letter indicates that Damschroder had discussed the matter with Husted or that Husted had asked him to relay this information to Plaintiffs. Defs.' Ex. 11, at 69, 87-88. At the preliminary injunction hearing, however, Damschroder testified that he did, in fact, discuss the matter with senior staff and with Husted. They decided that Damschroder would send a letter "to the Board Members on behalf of the Secretary of State" indicating that they needed to reconvene that afternoon to

The Board met again that afternoon as directed. Lieberman reiterated his position that he did not believe that his motion was inconsistent with the Directive. Defs.' Ex. 8, at p. 3. John Cumming, the Board's legal advisor, agreed that the Directive was ambiguous as to whether local boards were permitted to maintain early weekend hours. He believed that the Directive could be interpreted to set a floor rather than a ceiling, and that Lieberman's earlier motion, therefore, was not in contravention of the Directive. *Id.* at 4. Cumming further noted that Damschroder had implicitly conceded that the Directive was ambiguous when he attempted to clarify any misunderstanding. Cumming opined, however, that, regardless of the fact that Lieberman had acted in good faith in making the motion at the morning meeting, the Board was now bound by the Directive as amended or clarified by Damschroder's letter. *Id.*

Lieberman nevertheless refused to rescind the motion. After expressing his belief that no other board member had authority to rescind a motion that he alone had made, Lieberman moved to adjourn the meeting. Gantt seconded the motion and the Board voted in favor of adjournment. *Id.* at 11-12.

At that point, the Board assumed that they would submit position papers on the issue as originally planned, so that the Secretary of State could break the tie vote. At 6:00 that same evening, however, before any briefs had been submitted,

---

reconsider the motion that resulted in a tie vote. Hr'g Tr. at 189, 194. Damschroder further testified that it was customary for him, as Director of Elections, to send such letters, and that Husted had authorized him to do so. *Id.* at 191, 236. This is sufficient, at this point, to show that Damschroder acted on Husted's behalf and with his knowledge and approval.

the Secretary of State sent a letter to Betty Smith, breaking the tie. He determined that no early weekend voting would be allowed. Husted stated, "[g]iven that only 45 days remain until in person absentee voting begins (October 2, 2012) and the unmistakable clarity provided by my office both in Directive 2012-35 and my Director of Elections' letter to the Montgomery County Board of Elections earlier today (attached), it is unnecessary to wait another two weeks to resolve this matter." Defs.' Ex. 9.[4]

By separate letter, also dated August 17, 2012, Husted notified Lieberman and Ritchie that, pursuant to Ohio Revised Code § 3501.16, he was beginning the process of removing them as members of the Board for nonfeasance, citing their refusal to act in accordance with Directive 2012-35.[5] He instructed them to appear in person at his office at 9:00 a.m. on Monday, August 20, 2012, before a hearing officer, at which time they would have the opportunity to be heard as to why they should not be removed as members of the Board. Defs.' Ex. 10. On August 20, 2012, Lieberman and Ritchie, represented by counsel, appeared as directed before Hearing Officer Jonathan Allison. During that hearing, which lasted nearly

---

[4] As noted earlier, in cases of a tie vote, Ohio Revised Code § 3501.11(X) permits the Secretary to "summarily decide the question." The Supreme Court of Ohio has held that the Secretary has the authority to truncate the 14-day period in order to "expedite matters in election situations." *State ex rel. Painter v. Brunner*, 128 Ohio St.3d 17, 2010-Ohio-2205, 941 N.E.2d 782, at ¶ 43 n.2.

[5] Ohio Revised Code § 3501.16 states, in relevant part, that "[t]he Secretary of State may summarily remove or suspend any member of a board of elections . . . for neglect of duty, malfeasance, misfeasance, or nonfeasance in office, for any willful violation of Title XXXV of the Revised Code, or for any other good and sufficient cause."

three hours, both sides presented witnesses and exhibits. Defs.' Ex. 11.

Allison issued a 15-page Report and Recommendation on August 27, 2012, recommending that the Secretary of State remove Lieberman and Ritchie from their positions as Board members. He acknowledged that it was clear that Lieberman and Ritchie believed that Lieberman's motion, made on the morning of August 17, 2012, was consistent with Directive 2012-35. However, Allison rejected their argument that the Directive was ambiguous concerning weekend hours for in-person absentee voting, particularly when read in conjunction with Damschroder's letter. Regardless of whether Plaintiffs had acted in good faith in the morning, Damschroder's letter left no doubt as to the meaning of the Directive. Allison concluded that Lieberman, "in making his motion, voting for it and later refusing to rescind it did so in contravention of Directive 2012-35 and in violation of R.C. 3501.11," and that Ritchie, "who seconded the motion and voted for it, also did so in contravention of R.C. 3501.11."[6] Defs.' Ex. 13. Allison concluded that their failure to follow the Directive constituted nonfeasance and warranted removal. *Id.*

On August 28, 2012, Husted, following Allison's recommendation, dismissed Lieberman and Ritchie from the Board for their failure to follow Directive 2012-35. In the letter of dismissal, Husted stated:

> Board members are free to express their discontent with any Directive or Advisory issued, but they cannot disobey them. Your dismissal is not about differing views; it is about you [sic] violating the law by not

---

[6] Section 3501.11(P) requires board members to "[p]erform other duties as prescribed by law or the rules, directives, or advisories of the secretary of state."

following a Directive (R.C. 3501.11).  You were given subsequent chances to comply and refused to take corrective action.

Defs.' Ex. 14.

On August 30, 2012, Husted directed the Montgomery County Democratic Party to nominate successor Board members no later than September 12, 2012. Defs.' Ex. 15.

On September 10, 2012, Lieberman and Ritchie filed their Complaint, along with their motion for a temporary restraining order.  Docs. ##1, 2.  Noting that the election was just around the corner, they argued that if the requested relief were not granted, the Board would lack a quorum and would be unable to function.  In addition, Plaintiffs noted that, between them, they have almost thirty years of experience managing elections in Montgomery County.  They maintained that because any newly-appointed members would face a steep learning curve, public interest demanded that Plaintiffs be reinstated to their positions on the Board.

During a conference call with counsel on September 11, 2012, the Court acknowledged that the Democratic Party had nominated successor Board members and that Husted had issued their certificates of appointment earlier that day.  Accordingly, counsel for Plaintiffs amended their request for a temporary restraining order to include rescission of those new appointments.  The successor appointees, Rhine McLin and John Doll, indicated that they would willingly step down if Lieberman and Ritchie were reinstated.  The Court noted that the appointment of the new Board members greatly decreased the sense of urgency and the risk of irreparable harm.  On September 18, 2012, the Court filed an Entry

9

declaring Plaintiffs' motion for a temporary restraining order, Doc. #2, to be moot. Doc. #9.

In their Fourth Claim for Relief, Plaintiffs requested "temporary and permanent injunctive relief."  Compl. ¶ 66.  Although Plaintiffs did not file a separate motion for a preliminary injunction, the Court proceeded in accordance with this prayer for relief, and set the matter for a preliminary injunction hearing, which was held on September 21, 2012.[7]  At the close of the hearing, the Court directed the parties to file post-hearing briefs.  On September 24, 2012, McLin and Doll, deemed to be indispensible parties, were added to this litigation as defendants.  Doc. #17.

## II.    Preliminary Injunction Standard

Federal Rule of Civil Procedure 65 allows the Court, in its discretion, to issue a preliminary injunction.[8]  An injunction is an equitable remedy, issued only

---

[7]  The Court is unaware of any legal requirement, as opposed to a local rule of court, that a separate, written motion for a preliminary injunction be filed.

[8]  Citing New Orleans Public Service, Inc. v. Council of the City of New Orleans, 491 U.S. 350, 361 (1989), Defendant urges the Court to decline to issue an injunction because "the exercise of federal review . . . would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."  This concept is known as Burford abstention.  Defendant argues that granting injunctive relief "would disrupt the state's strong policy objective of achieving uniformity in the elections process."  Doc. #23, at 10.  This case, however, is not about achieving uniformity in the elections process in the State of Ohio.  Rather, Plaintiffs' claims stem solely from Husted's isolated decision to remove them as board members.  The relevant question is whether Husted acted within the boundaries of the law in doing so.  Accordingly, this is not an appropriate case for Burford abstention.

when there is no adequate remedy at law. *Northern Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1307 (1984). The purpose of a preliminary injunction is to preserve or restore the status quo pending a trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

In determining whether a preliminary injunction should be granted, the Court must consider and balance the following four factors: "(1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief." *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (quotation omitted). The movant must make a "clear showing" that he or she is entitled to injunctive relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).

## III.    Application

### A.    Substantial Likelihood or Probability of Success on the Merits

The first factor to be considered is whether Plaintiffs can establish a substantial likelihood or probability of success on the merits of their claims.

#### 1.    Procedural and Substantive Due Process

In Count I of their Complaint, Plaintiffs allege procedural and substantive due process violations. They maintain that they were not given a meaningful hearing prior to their removal from the Board, and that their removal was arbitrary,

11

lacked a statutory basis, and was based on political and personal motivations.

The Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause has a procedural component and a substantive component. As the Sixth Circuit explained in *Howard v. Grinage*, 82 F.3d 1343, 1349-50 (6th Cir. 1996), "substantive due process prohibits the government's abuse of power or its use for the purpose of oppression, and procedural due process prohibits arbitrary and unfair deprivations of protected life, liberty, or property interests without procedural safeguards."

The Substantive Due Process Clause protects against "government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). These include "the specific freedoms protected by the Bill of Rights," as well as the right to marry, have children, direct the education and upbringing of those children, marital privacy, the use of contraception, bodily integrity, and abortion. *Id.* As a general rule, the Substantive Due Process Clause does not protect any state-created rights. *Charles v. Baesler*, 910 F.2d 1349, 1353 (6th Cir. 1990). The Sixth Circuit has held that "[a]bsent the infringement of some 'fundamental' right, it would appear that the termination of public employment does not constitute a denial of substantive due process." *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1351 (6th Cir. 1992).

In this case, in the context of their substantive due process claim, Plaintiffs have failed to identify any fundamental right or liberty interest that was violated by

12

their removal from the Board.  Under the circumstances presented here, Plaintiffs have failed to establish a substantial likelihood or probability of success on the merits of their substantive due process claim.

The procedural component of the Due Process Clause requires an individual to be given the opportunity to be heard "in a meaningful manner" before the government infringes on a protected life, liberty, or property interest.  *Howard*, 82 F.3d at 1349 (quoting *Loudermill v. Cleveland Bd. of Educ.*, 721 F.2d 550, 563 (6th Cir. 1983), aff'd, 470 U.S. 532 (1985)).  In *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454 (1989), the United States Supreme Court explained:

> We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972); the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient, *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. at 871.

*Thompson*, 490 U.S. at 460.

Under the first step, "an individual claiming a protected interest must have a legitimate claim of entitlement to it."  *Id.*  That claim of entitlement may arise from a statute, a contract, or a promise made by the employer.  In this case, Plaintiffs' claim of entitlement arises from a statute.  As noted earlier, Ohio Revised Code § 3501.16 allows the Secretary of State to remove a board member "for neglect of duty, malfeasance, misfeasance, or nonfeasance in office, for any willful violation of Title XXXV of the Revised Code, or for any other good and sufficient cause."

13

In the Court's view, this "good cause" requirement creates a legitimate expectation of continued employment and a protectible property interest. *See Loudermill*, 470 U.S. at 538-39 (holding that the Ohio statute providing that classified civil service employees could not be dismissed except for misfeasance, malfeasance, or nonfeasance in office created a protected property interest in continued employment).[9]

Plaintiffs must also show, however, that they were denied adequate notice and the opportunity to be heard in a meaningful manner prior to their removal from the Board. At a minimum, due process requires that the employee be given "oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer." *Buckner v. City of Highland Park*, 901 F.2d 491, 494 (6th Cir. 1990). Pre-deprivation proceedings "need not be elaborate," particularly when state law provides for full post-termination proceedings. *Id.* at 494-95 (citing *Loudermill*, 470 U.S. at 545). "[P]redeprivation hearings are intended only to be an 'initial check' on the employer's decision, and 'need not definitively resolve the propriety of' the

---

[9] Citing *Bracken v. Collica*, 94 Fed. App'x 265, 267 (6th Cir. 2004), *Christophel v. Kukulinsky*, 61 F.3d 479, 482 (6th Cir. 1995), and *State ex rel. Gordon v. Barthalow*, 150 Ohio St. 499, 508 (1948), Defendant argues that because, as public officials, Plaintiffs are unclassified civil servants, they have no protected property interest in continued employment. Those cases, however, are readily distinguishable. In contrast to the unclassified employees in those cases, who are terminable at will, Plaintiffs here have a separate statutory guarantee that they will be removed from office only "for neglect of duty, malfeasance, misfeasance, or nonfeasance in office, for any willful violation of Title XXXV of the Revised Code, or for any other good and sufficient cause." Ohio Revised Code § 3501.16. In this respect, Plaintiffs are more akin to the classified civil service employees in *Loudermill*.

action." *Leary v. Daeschner*, 228 F.3d 729, 744 (6th Cir. 2000) (quoting *Loudermill*, 470 U.S. at 545).

Plaintiffs in this case clearly received adequate notice. It is undisputed that they were warned that failure to rescind the motion in question would subject them to possible removal from their positions on the Board. It is also undisputed that on August 17, 2012, after they refused to rescind the motion, they were given written notice that they were being charged with "nonfeasance," and that a pre-disciplinary hearing would be held on August 20, 2012. Plaintiffs argue that it was not initially clear to them whether the alleged "nonfeasance" stemmed from their conduct at the morning meeting, the afternoon meeting, or both. At the beginning of the show cause hearing, however, counsel for Defendant clarified that both were at issue and the hearing subsequently proceeded on that basis.

Plaintiffs maintain, however, that they were given insufficient time to prepare for the hearing and to brief the issues. Compl. ¶ 53. They received notice on Friday evening and had to appear for the hearing the next Monday morning. It is undisputed, however, that Plaintiffs testified at the hearing and presented numerous exhibits. Moreover, they admit that, despite the short notice, they were able to make "a record of factual and Constitutional concerns relevant to the issues presented." Lieberman Aff. ¶ 30. The fact that they had only the weekend to prepare for the hearing does not necessarily mean that their opportunity to be heard was constitutionally deficient. *See Leary*, 228 F.3d at 743-44 (holding that the district court did not abuse its discretion in refusing to require further predeprivation process when employees were given only one morning to prepare

for a hearing).

Plaintiffs also argue that Allison, the hearing officer, "has a history of active involvement in Republican politics," Lieberman Aff. at ¶ 31, and was "simply an alter-ego of Mr. Husted who attempted to put a gloss of due process on Mr. Husted's previously made decisions to terminate the Plaintiffs' service as members of the Board."  Compl. ¶ 54.

Plaintiffs' speculation of bias does not render the hearing constitutionally deficient.  Unlike a post-deprivation hearing, which must be conducted by an impartial judge, a pre-deprivation hearing is designed simply to give the employer an opportunity to reconsider its decision after hearing the employee's side of the story.  As a general rule, the employee is not entitled to a neutral, impartial decisionmaker at this stage of the proceedings.  *See Duchesne v. Williams*, 849 F.2d 1004, 1007-08 (6th Cir. 1988).  Moreover, although Plaintiffs clearly did not agree with Allison's recommendation, there is no evidence in the record, either in the transcript of the show cause hearing or in Allison's report to Husted, to support a finding that Allison failed to perform his duties in a fair, impartial and judicious manner.

Under the circumstances presented here, the Court concludes that it is unlikely that Plaintiffs will be able to prove that the pre-deprivation hearing fell short of procedural due process requirements.[10]

---

[10]  Defendant Husted has also argued that Plaintiffs were required to plead and prove that post-removal state remedies are unavailable or inadequate to remedy the wrong.  The Court rejects this argument.  In *Parratt v. Taylor*, 451 U.S. 527 (1981), a prison inmate filed suit after prison officials lost hobby materials that

### 2. First Amendment Retaliation

In Count II of their Complaint, Plaintiffs allege that, in making the motion to the Board and voting on that motion, they were exercising their First Amendment right to freedom of speech. They maintain that Husted retaliated against them by ordering Lieberman to rescind his motion and by terminating them before the relevant issues were fully briefed and resolved through the established procedures for breaking a tie vote. Plaintiffs further allege that this retaliatory conduct will have a chilling effect on other board of elections members throughout Ohio.

To succeed on this claim, Plaintiffs must show that: (1) they engaged in constitutionally protected conduct; (2) they were subjected to an adverse employment action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was taken at least in part because of the protected conduct. *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010).

---

he had ordered through the mail. In that situation, the Supreme Court held that in order to succeed on a procedural due process claim in federal court under 42 U.S.C. § 1983, a plaintiff must show that state procedures were inadequate to compensate for the deprivation of property. This requirement, however, "applies only where the deprivation complained of is random and unpredictable, such that the state cannot feasibly provide a predeprivation hearing." *Silberstein v. City of Dayton*, 440 F.3d 306, 315 (6th Cir. 2006) (citing *Zinermon v. Burch*, 494 U.S. 113, 132 (1990)). "When a deprivation occurs through an established state procedure, 'then it is both practicable and feasible for the state to provide pre-deprivation process, and the state must do so regardless of the adequacy of any post-deprivation remedy.'" *Id.* at 316 (quoting *Walsh v. Cuyahoga County*, 424 F.3d 510, 513 (6th Cir. 2005)). In this case, because Plaintiffs' removal was accomplished through an established state procedure, they need not plead or prove that the State's post-removal procedures are inadequate to remedy the wrong. *See Mitchell v. Fankhauser*, 375 F.3d 477, 484 (6th Cir. 2004).

Plaintiffs' First Amendment retaliation claim appears to be foreclosed by the Supreme Court's holding in *Garcetti v. Ceballos,* 547 U.S. 410 (2006). In that case, a deputy district attorney filed suit against the county and his supervisors, alleging that they retaliated against him after he wrote a memorandum challenging inaccuracies contained in an affidavit used to obtain a critical search warrant. The Court held that because he made the statements at issue pursuant to his official duties, he was not speaking as a private citizen for First Amendment purposes, and his speech was therefore not protected from employer discipline. *Id.* at 421.

In this case, Lieberman made the motion at issue pursuant to his official duties as a member of the Board. Likewise, Ritchie voted on that motion pursuant to his official duties as a Board member. Under the holding in *Garcetti*, the speech at issue does not appear to be constitutionally protected.[11] For this reason, the Court finds that Plaintiffs have failed to demonstrate a substantial likelihood or probability of success on the merits of their First Amendment retaliation claim.

### 3.    Equal Protection

In Count III of their Complaint, Plaintiffs allege that Defendant denied them equal protection of the law. Under the Equal Protection Clause of the United States Constitution, "states cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference." *Radvansky v.*

---

[11] Having determined that the speech is not protected, the Court need not consider whether Plaintiffs' removal from the Board will have a chilling effect on other local boards of elections, and need not consider the letter to that effect from Timothy Burke, Chair of the Hamilton County Board of Elections. Pls.' Ex. 8.

*City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005).

Here, Plaintiffs argue that Husted removed them from the Board after they failed to rescind the motion, but took no comparable disciplinary action against the Republican board members who voted to adjourn the meeting on Friday afternoon, instead of moving to rescind Lieberman's motion.  Plaintiffs maintain that Damschroder essentially ordered the entire Board to "undo" what had been done at the morning meeting, yet only Plaintiffs were punished for failing to do so. According to Plaintiffs, there was no rational basis for the difference in treatment.

Defendant Husted argues that Plaintiffs cannot show a likelihood of success on this claim because the Supreme Court has held that "class-of-one" equal protection claims are not cognizable in the public employment context.  *See Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).  Plaintiffs have offered no argument or authority to the contrary.

Husted further argues that, even if such a claim were cognizable, Plaintiffs cannot show that the decision to remove them and not the Republican board members lacked a rational basis.  The Court agrees.  The Republican board members were not similarly situated to Lieberman and Ritchie.  Only Lieberman made the motion that allegedly violated the Secretary of State's Directive.  Only he and Ritchie voted in favor of the motion.  The Republican board members voted against it.  As Lieberman noted at the afternoon meeting, it is axiomatic that only the person who made the motion has the right to rescind it.  Therefore, the

19

Republican board members cannot be faulted for failing to rescind Lieberman's motion.  For these reasons, the Court finds that Plaintiffs have failed to establish a substantial likelihood or probability of success on the merits of their equal protection claim.

### 4.    Wrongful Termination

In Count IV of their Complaint, Plaintiffs generally allege wrongful termination "in violation of the Constitution and Employment Law of the State of Ohio."  Compl. ¶ 69.  As Defendants note, the exact contours of this claim remain very unclear, even after post-hearing briefing.  Plaintiffs have not yet identified which state constitutional provisions or which employment laws were allegedly violated.

Defendant Husted argues that Plaintiffs cannot prevail on this claim for two reasons.  He first argues that because Plaintiffs initially failed to seek a judicial determination of statutory immunity in the Ohio Court of Claims, this Court lacks jurisdiction over the wrongful termination claim.  *See* Ohio Revised Code § 2743.02(F) (providing that the Court of Claims has exclusive, original jurisdiction to determine whether a state officer is entitled to personal immunity under Ohio Revised Code § 9.86).  Husted also argues that, to the extent that Plaintiffs allege wrongful termination in violation of public policy, they have failed to identify any clear public policy that was jeopardized by their removal.  *See Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 151 (1997) (setting forth elements of such a claim).  Defendant maintains that, because this is a required element, Plaintiffs' claim is

20

not viable.

The Court notes that Plaintiffs have not responded to either of these arguments. This, combined with Plaintiffs' failure to identify the relevant state constitutional provisions or employment laws allegedly implicated by Husted's conduct, makes it nearly impossible for the Court -- at this juncture -- to find that Plaintiffs have satisfied their burden of establishing a substantial likelihood or probability of success on the merits of this state law claim.

Even if Plaintiffs had established a substantial likelihood of success on the merits of any of their claims, the other factors weigh against the issuance of a preliminary injunction.


**B.    Threat of Irreparable Harm**

The next factor that the Court must consider is the threat of irreparable harm to Plaintiffs if the requested relief is not granted. Traditionally, equity requires that irreparable harm be shown before a preliminary injunction may be issued. *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57 (1975). Harm is irreparable if it cannot be fully compensated by money damages, or if the nature of the injury makes money damages difficult to calculate. *See Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

Plaintiffs admit that money damages would fully compensate them for their loss of salary. They argue, however, that money damages cannot fully

21

compensate them for the alleged violations of their constitutional rights or the alleged damage to their reputations.

Irreparable injury is presumed when constitutional rights are implicated. Nevertheless, because the Court has already determined that Plaintiffs are unlikely to succeed on their constitutional claims, that presumption is inapplicable here. See Overstreet, 305 F.3d at 578. Therefore, evidence of irreparable injury must be shown.

Plaintiffs further argue that they will suffer irreparable harm because the damage to their reputations and to their families as a result of their highly-publicized removal from the Board is difficult to quantify and is not fully compensable by money damages. In Sampson v. Murray, 415 U.S. 61, 92 (1974), however, the Supreme Court held that humiliation and damage to reputation resulting from termination typically does not rise to the level of irreparable harm. The Court did leave open the possibility that "in the genuinely extraordinary situation," injunctive relief may be warranted. Id. at 92 n.68. In Bedrossian v. Northwestern Memorial Hospital, 409 F.3d 840, 845 (7th Cir. 2005), the court, citing Sampson, held that when damage to reputation forms the basis for a claim of irreparable harm, "the type of irreparable injury required must really depart from the harms common to most discharged employees."

Here, Lieberman argues that, as an attorney, his reputation in the legal community is crucial to his success. Likewise, Ritchie, who conducts negotiations and mediations in the labor union arena, argues that his reputation for integrity is

critical. Both maintain that their removal from the Board has tarnished their reputations and could jeopardize their ability to continue to earn a living.

There is no doubt that Plaintiffs are engaged in professions where reputation is extremely important to continued success, but the same can be said for a great many jobs. In the Court's view, Plaintiffs have failed to demonstrate that their circumstances are truly distinguishable from the harms suffered by any other discharged employee, or that theirs is a "genuinely extraordinary situation."

Even assuming *arguendo* that the nature of their alleged injury is "genuinely extraordinary," they have failed to demonstrate that irreparable injury is likely if injunctive relief is not granted. In *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008), the Supreme Court held that it is not enough for a party seeking injunctive relief to show a "possibility" of irreparable harm; instead, it must be shown that irreparable injury "is *likely* in the absence of an injunction." The harm alleged cannot be "speculative or theoretical." Rather, "[i]n order to substantiate a claim that irreparable injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and is likely to occur again." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).

Plaintiffs have failed to satisfy this burden. At the evidentiary hearing, Lieberman testified about the "possible impact" of his removal from the Board. He speculated that he could be subjected to disciplinary action as an attorney for violating the law. Hr'g Tr. at 72. He also testified that the allegations against him

"could conceivably" damage his reputation as attorney. *Id.* at 73. In addition, he testified that there has been "some discussion" as to how his removal from the Board of Elections might impact his service on Miami University's Board of Trustees. *Id.* Lieberman further speculated that his removal "could" also have an impact on his wife, who is running for county commissioner. *Id.* Lieberman also testified:

> My children will have teachers approach them about this. Other kids will say: Hey, I saw your dad got fired. The – and it depends. Some of the children that will talk to him will suggest that I broke the law. Some will ask when I'm getting arrested. It's impacted him. More my high-school level son than my college son.

*Id.* at 74-75. In a similar vein, Ritchie testified, "I think that I've been tainted," and "what's happened is going to be life changing for that reputation that I tried to build." *Id.* at 161-62.

While both Plaintiffs speculated as to the *possible* impact their removal might have on their careers, their families, and their reputations, they presented no evidence that the alleged harms were *likely* to actually materialize. No current or potential clients testified that Plaintiffs' removal from the Board eroded any faith they had in Plaintiffs' abilities, or would deter them from engaging Plaintiffs' services. Lieberman presented no evidence that disciplinary proceedings against him were actually contemplated, that he was subject to removal from the Miami University Board of Trustees, or that voters would think twice about voting for his wife because he had been removed from the Board of Elections. Likewise, Ritchie presented no evidence that his removal from the Board would actually have a

24

negative impact on his career.

Under the circumstances presented here, the Court finds that Plaintiffs have failed to show that they would suffer irreparable harm if the preliminary injunction is not issued.

### C.    Substantial Harm to Others if Injunction Issues

The next factor to be considered is whether the issuance of the requested injunction will cause substantial harm to others.  Plaintiffs argue that, if the Court orders them reinstated, there is no risk of substantial harm to anyone else.  They note that the successor board members have gladly agreed to step aside if Plaintiffs, who are much more experienced in election matters, are reinstated.

Plaintiffs further argue that Defendant Husted will not be substantially harmed since he still has the power to issue Directives.  They also maintain that he would actually benefit from having more experienced board members reinstated.  Defendant Husted, however, argues that granting the requested injunctive relief would undermine his authority and limit his future ability to enforce Directives.

In the Court's view, in comparison to the other factors, this factor is not particularly important to the issues presented here, and does not weigh heavily in favor of either party.

### D.     Public Interest

Finally, the Court must consider whether it is in the public interest to issue a preliminary injunction.  Plaintiffs maintain that, without their expertise and experience on the Board, there is a risk that the upcoming presidential election process will suffer.  Doll and McLin both testified about the steep learning curve they face as newly-appointed board members.  Hr'g Tr. at 10-12, 19.

Defendant Husted denies that reinstatement of Plaintiffs is in the public interest.  Even though the successor Board members may lack Plaintiffs' experience and may face a steep learning curve, there is no evidence that they are unqualified to serve or are incapable of handling whatever situations may arise.

In the Court's view, this factor tips slightly in Plaintiffs' favor.  Nevertheless, because Plaintiffs have failed to establish a likelihood of success on the merits of their claims, and have failed to establish irreparable harm, this factor does not constitute an adequate basis for granting their request for a preliminary injunction.


## IV.     Conclusion

Having fully considered the four factors set forth above, the Court finds that Plaintiffs have failed to make a clear showing that they are entitled to the requested relief.  The Court therefore OVERRULES Plaintiffs' request for a preliminary injunction.

Counsel of record will note that a telephone conference call will be convened, beginning at 1:00 p.m. on Tuesday, November 13, 2012, for the

26

specific purpose of setting an early trial date and other dates leading to the resolution of this lawsuit.

On October 1, 2012, Defendant Husted filed a Motion to Dismiss Plaintiffs' Complaint (Doc. #20), a motion which is not yet fully briefed and upon which the Court does not rule herein. However, Defendant's arguments therein, to the extent they were referenced in his post-hearing memoranda, were fully considered. During the conference call set above, the Court will establish a briefing schedule for said motion. The motion, once at issue, will be decided prior to discovery and motion practice on the merits of the litigation.


Date: October 25, 2012

WALTER H. RICE
UNITED STATES DISTRICT JUDGE